# In the United States Court of Federal Claims

No. 11-715C

(E-Filed: October 31, 2016)

| | |
|---|---|
| ALAN GROSS, | ) |
| | ) |
| Plaintiff, | ) Sunday premium pay; 5 U.S.C. § |
| | ) 5546(a); Motion for Partial Dismissal; |
| v. | ) Cross-Motions for Summary |
| | ) Judgment; Renewed Motion to Certify |
| THE UNITED STATES, | ) a Class. |
| | ) |
| Defendant. | ) |
| | ) |

Arlene F. Boop, Doris G. Traub, and Daniel L. Alterman, New York, NY, for plaintiff.

Kenneth S. Kessler, Trial Attorney, and Kenneth D. Woodrow, Trial Attorney, with whom where Joyce R. Branda, Acting Assistant Attorney General, Robert E. Kirschman, Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Adam Chandler, Attorney, Bureau of the Census, United States Department of Commerce, Washington, DC, of counsel.

## OPINION AND ORDER

CAMPBELL-SMITH, Chief Judge

Plaintiff, an employee of the United States Census Bureau ("Census Bureau"), contends that he and others similarly situated have not been paid the Sunday premium pay to which they are entitled under federal law. Presently before the court are defendant's motion for a partial dismissal of plaintiff's claims, the parties' cross-motions for summary judgment, and plaintiff's renewed motion for class certification. The court **GRANTS** defendant's motion for partial dismissal, **DENIES** defendant's motion for summary judgment, and **GRANTS** plaintiff's motions for summary judgment and class certification.

I.      Background

        A.      Organization of the Census Bureau

        The Census Bureau is part of the Economic and Statistics Administration of the
United States Department of Commerce ("Commerce Department").[1]  Jt. Stip. ¶ 1.
Within the Census Bureau is a Field Directorate which is overseen by the Associate
Director of Field Operations.  Id. ¶ 2.  The Field Directorate includes the National
Processing Center and the Field Division.  Id.  The National Processing Center manages
three telephone centers (also referred to as contact centers), respectively located in
Jeffersonville, Indiana, Tucson, Arizona, and Hagerstown, Maryland.  Id. ¶ 7.  The Field
Division is comprised of an office at Census Bureau headquarters in Suitland Maryland,
and six regional offices; prior to 2012, there were twelve regional offices.  Id. ¶¶ 3-4.

        B.      Census Bureau Interviewers

        The Census Bureau employs, as interviewers, individuals who conduct interviews
to gather information for surveys commissioned by the federal government and private
businesses.  Id. ¶ 5.  Included among the surveys are the Current Population Survey
("CPS"), the Survey of Income and Program Participation ("SIPP"), the National
Ambulatory Medical Care Survey, and the Consumer Expenditure Quarterly Survey.
Def.'s Ex. A at 5; Def.'s Ex. B at 9; Def.'s Ex. C at 15; Def.'s Ex. D at 21; Def.'s Ex. E
at 27.  In the Field Directorate, interviewers work either for one of the three contact
centers managed by the National Processing Center or for one of the Field Division's
regional offices.  Jt. Stip. ¶¶ 6-7.  The interviewers have varying job titles:  (1) at the
Jeffersonville contact center, the interviewers are classified as Statistical Clerks;[2] (2) at
the Tucson and Hagerstown contact centers, the interviewers are classified as Telephone
Interviewers; and (3) at the regional offices, the interviewers are classified as either Field

---

[1]     The court derives the facts in this section from the parties' joint stipulation of facts
("Jt. Stip.", ECF No. 40), the decisions in Fathauer v. United States, 566 F.3d 1352 (Fed.
Cir. 2009), and Gross v. United States, 106 Fed. Cl. 369 (2012), the exhibits submitted by
plaintiff ("Traub Ex.," "Boop Ex.," "Savits Ex.," "Traub Supp'l Ex."), and the exhibits
submitted by defendant ("Def.'s Ex.").  Due to the inconsistent pagination in plaintiff's
exhibits and the almost complete lack of pagination in defendant's exhibits, the court
refers to the page numbers assigned by its electronic case filing system.

[2]     Plaintiff represents, and defendant does not dispute, that this action does not
involve the Statistical Clerks who conduct telephone interviews from the Jeffersonville
contact center.  See Pl.'s MSJ 5 n.2.  Defendant explains that no part-time interviewers
work at that contact center.  Def. Ex. A at 6.

Representatives or Senior Field Representatives (collectively, "Field Representatives").
Id. ¶¶ 7-8.

The Telephone Interviewers conduct interviews from the contact centers; they enter responses of the survey participants into computers located at the centers. Jt. Stip. ¶¶ 7, 11. The Field Representatives conduct telephone interviews from their own homes or at either the homes or the businesses of the survey respondents; they enter the responses of the survey participants into government-issued laptop computers. Id. ¶¶ 10-11. The Senior Field Representatives perform the same work as Field Representatives. In addition, they have certain training responsibilities, to include conducting field observations of, and providing on-the-job feedback to, the Field Representatives. Id. ¶ 9.

C.    Interviewers' Work Schedules

The Telephone Interviewers and the Field Representatives are appointed to their positions under Schedule A of excepted service. Id. ¶ 12. Appointed as mixed tour employees, they work either intermittent, part-time, or full-time schedules. Id. ¶ 13. All newly hired interviewers start on an intermittent work schedule. Id. ¶ 14. They convert from an intermittent work schedule to a part-time work schedule once they establish a work pattern that exceeds a fixed minimum number of hours per quarter, and such work hours are reasonably expected to continue. Id. ¶¶ 15-16. For Telephone Interviewers, the fixed minimum number of hours is 150; for Field Representatives, it is 240. Id. Field Representatives also must demonstrate a predictable work pattern of hours over two consecutive quarters of pay intervals before they become eligible to convert to a part-time work schedule. Id. ¶ 17. Once Field Representatives convert to a part-time work schedule, they remain on that schedule if there is sufficient work to do and the Field Representatives are performing satisfactorily. Id. ¶ 21. The Census Bureau determines the type of work schedule for each interviewer and completes, as documentation, a Standard Form 50. Id. ¶ 18.

Part-time Telephone Interviewers work in shifts of normally less than eight hours in duration. These work shifts are scheduled two weeks in advance by contact center management. Id. ¶ 23. These work schedules vary from pay period to pay period depending on the amount of available work. Id. ¶ 24. Part-time Telephone Interviewers are able to swap hours amongst themselves, subject to supervisor approval. Id. ¶ 25.

In contrast, part-time Field Representatives set their own hours based on workload and the availability of survey respondents. Id. ¶ 26. If Field Representatives are unable to complete their assigned work timely, their supervisors may reassign the work to others. Id. ¶ 27. The administrative workweek for Field Representatives spans from Sunday at 12:01 a.m. to Saturday at midnight. Id. ¶ 33; cf. id. ¶ 20. Field Representatives must report the hours they have worked by date. Id. Part-time Field Representatives are

eligible for overtime pay and, if they have performed night and holiday work, for premium pay. Id. ¶ 22.

As a condition of employment, Telephone Interviewers and Field Representatives must be amenable to weekend work. Id. ¶ 28. Night work and weekend work allow these employees to reach survey respondents who are available at such times. Id. ¶ 29.

For all surveys conducted by the Census Bureau, Sunday interviewing is permitted. Id. ¶ 35. For some of the surveys, the interviewing is expected to begin on a Sunday. Id. ¶ 34. The SIPP survey, for example, is a monthly survey that must start on the first day of the month – without regard to whether it falls on a Sunday. Id. ¶ 38. The interviewing period for another survey, the CPS survey, begins on a pre-determined Sunday and runs for either ten or eleven days: this period of time, which is known as the "CPS Week," includes two Sundays. Def.'s Ex. D at 2. Prior to CPS Week, the regional offices issue memoranda and calendars pertaining to that month's survey. See generally Def.'s Exs. H-Q. The regional offices permit the Field Representatives to work through the last day of interview period during CPS week and occasionally request that the field representatives provide daily transmittals back to the office. Jt. Stip. ¶ 37.

Field Representatives may perform other work on Sundays as well. Some survey instructions require daily phone calls from Field Representatives to Senior Field Representatives during specified weeks. Id. ¶ 36. Centralized training sessions also may be scheduled on Sundays, id. ¶ 39, and Senior Field Representatives may conduct their field observations of Field Representatives on Sundays, id. ¶ 40.

Sunday's work permits Field Representatives to achieve high survey response rates, to complete various surveys timely, and to attain Census Bureau's survey goals. Id. ¶¶ 30-32. But, part-time Field Representatives have never received premium pay for the work they have performed, and continue to perform, on Sundays. Id. ¶¶ 73, 75.

D.      The Fathauer Decision and the Census Bureau

The Sunday premium pay statute provides:

> An employee who performs work during a regularly scheduled 8-hour period of service which is not overtime work as defined by section 5542(a) of this title a part of which is performed on a Sunday is entitled to pay for the entire period of service at the rate of his basic pay plus premium pay at a rate equal to 25 percent of his rate of basic pay.

5 U.S.C. § 5546(a) (2006). For more than forty years, the federal government has interpreted this statute to apply only to full-time employees. Fathauer, 566 F.3d at 1352-53. However, on May 26, 2009, the United States Court of Appeals for the Federal

Circuit ("Federal Circuit") ruled in the Fathauer decision that the term "employee" in the Sunday premium pay statute includes both full-time and part-time employees. Id. at 1353, 1357.

As a result of the decision in Fathauer, the United States Office of Personnel Management ("OPM"), which serves as the federal government's human resources arm, Jt. Stip. ¶ 41, began issuing guidance to federal agencies about the payment of Sunday premium pay. On August 27, 2009, OPM advised counsel at the Census Bureau, by electronic mail, that eligible part-time employees should receive Sunday premium pay. Id. ¶ 46. Counsel at the Census Bureau forwarded OPM's message to an official at the Commerce Department's Office of Human Resources Management ("OHRM"). Id. ¶ 47. That OHRM official, in turn, forwarded the message to the director of the Census Bureau's Human Resources Division, among others. The director of the Census Bureau's Human Resources Division forwarded the message to persons within the division for "appropriate action." Id. ¶¶ 48-49. The Census Bureau's Human Resources Division then notified the Field Division of the Fathauer decision. Id. ¶ 50.

On December 8, 2009, OPM issued a memorandum of guidance to assist federal agencies with the processing of their employees' administrative claims for Sunday premium pay. Id. ¶ 51. Two weeks later, on December 24, 2009, the Commerce Department's OHRM issued a bulletin to those human resources divisions within the Commerce Department's various component agencies, including the Census Bureau's Human Resources Division, that were responsible for paying Sunday premium pay to part-time employees. Id. ¶ 52. The Commerce Department expected its subordinate agencies, through their respective human resources divisions, to provide notice to all part-time employees of their eligibility for Sunday premium pay. Id. ¶ 53. But, the Commerce Department did not monitor the subordinate agencies for compliance. Id. ¶ 54.

On July 13, 2010, an official from OHRM issued another bulletin with additional guidance about the processing of administrative claims for Sunday premium pay. Id. ¶ 58. But, not until March 7, 2011 did the Census Bureau begin to send notices to its employees regarding their entitlement to Sunday premium pay. Id. ¶ 59; cf. id. ¶ 69 (noting that the OHRM never advised Commerce Department components of the deadlines for submitting administrative claims for Sunday premium pay). On that date, the chief of the National Processing Center's Human Resources Branch notified all employees located in the Tucson and Hagerstown contact centers, including the Telephone Interviewers, of the procedure for filing administrative claims for Sunday premium pay. Id. ¶¶ 59-60. The chiefs of the individual contact centers also issued memoranda advising employees of the proper procedure for submitting an administrative claim. Id. ¶¶ 61-62. Nearly three months later, an official from the National Processing Center sent a memorandum to the employees of the Tucson and Hagerstown contact centers to update them on the administrative claims process. Id. ¶ 63.

Of the three classes of interviewers employed with the Census Bureau, only the Telephone Interviewers were advised that they could receive Sunday premium pay for the Sunday hours they had worked since May 2003.  Id. ¶ 60.  To receive payment, they had to establish the number of hours they had worked on various Sundays while in part-time status.  Id. ¶ 66.  To do so, they were provided access to National Processing Center computers.  Id. ¶ 67; see also id. ¶ 19 (stating that the personnel records contained within the Census Bureau's Human Resource Information System included employees' appointment type, work schedule, and work history).  The National Processing Center assisted the Telephone Interviewers with their claims: first by generating payroll records and verifying part-time status Sunday workhours, and then by submitting the administrative claims to the National Finance Center of the United States Department of Agriculture, the entity responsible for processing the Census Bureau's payroll.  Id. ¶¶ 57, 64-65, 68.  Eligible Telephone Interviewers ultimately received retroactive Sunday premium pay.  Id. ¶¶ 72, 74.  They continue to do so, and the Census Bureau has amended the job announcement for the Telephone Interviewer position to reflect the availability of Sunday premium pay.  Id. ¶ 76.

The Census Bureau has treated the part-time Field Representatives differently.  Neither the Commerce Department nor the Census Bureau notified these employees of either the Fathauer decision or the procedure for submitting an administrative claim for Sunday premium pay.  Id. ¶¶ 70-71.  The Field Representatives have never received retroactive Sunday premium pay.  Id. ¶¶ 73, 75.  Nor do they receive such pay now.  Moreover, the Census Bureau has not amended the job announcement for the Field Representative and Senior Field Representative positions to reflect the availability of Sunday premium pay.  Id. ¶ 77.

E.       Plaintiff's Application for Sunday Premium Pay

Plaintiff was hired by the Census Bureau in 1990.  Since his hiring, he has worked as a permanent, part-time Field Representative for the New York regional office.  Traub Ex. 6B; Def.'s Ex. Y at 60-61.  He first heard from a Telephone Interviewer who worked in the Hagerstown contact center that she had received Sunday premium pay.  Jt. Stip. ¶ 78.  He then learned of the Fathauer decision and discovered that other part-time Telephone Interviewers were receiving Sunday premium pay.  Id. ¶ 79.

On April 15, 2011, plaintiff sent a written letter of demand for Sunday premium pay to both the director of the New York regional office and an employee at the Pay, Benefits, and Services Branch in the Census Bureau's Human Resources Division.  Id.  As the chief of the Pay, Benefits, and Services Branch, Ms. Jodee Pritchett reviewed plaintiff's letter and discussed it with a colleague in the Human Resources Division.  Id. ¶ 80.  She then referred plaintiff's letter to counsel for the Census Bureau and expressed concern about both the potential cost of the part-time Field Representatives'

administrative claims and the need to treat all Census Bureau employees equally.  Id. ¶ 81.  Plaintiff's demand for Sunday premium pay prompted the Census Bureau to prepare an estimate of what it might owe to part-time Field Representatives in Sunday premium pay.  Id. ¶ 84.

On May 27, 2011, Ms. Pritchett sent a letter to plaintiff requesting additional information about his claim.  Id. ¶ 82.  Plaintiff responded on June 22, 2011.  Id. ¶ 83.  To date, neither the Commerce Department nor the Census Bureau has ruled on plaintiff's claim or determined whether permanent, part-time Field Representatives are eligible to receive Sunday premium pay.  Id. ¶ 86.  Following plaintiff's correspondence with the Human Resources Division, the New York regional office amended its monthly CPS memorandum.  It previously had stated that Field Representatives who conduct such surveys are "expected to work" on the first Sunday of the CPS; it now provides: "All CPS [Field Representatives] who have cases in their possession are encouraged to work the first Sunday (although this is not a requirement)."  Id. ¶ 85.

F.      Plaintiff's Lawsuit

Because the Census Bureau has not acted on his claim for Sunday premium pay, plaintiff filed this action.  He seeks for himself – and all similarly situated part-time Field Representatives within the Census Bureau – Sunday premium back pay from May 2003 to the present.  He asks the court to direct the Census Bureau to make such payments going forward and to reimburse his incurred attorneys' fees.  Compl. 7-8.

Shortly after filing his complaint, plaintiff moved for class certification.  Pl.'s Mot. to Certify Class, ECF No. 6.  The court denied that motion without prejudice, and the parties proceeded with discovery.  Gross v. United States, 106 Fed. Cl. 369 (2012).  Upon the close of fact discovery, the parties filed cross-motions for summary judgment.  Pl.'s Mot. for Summary J. (Pl.'s MSJ), ECF No. 44; Def.'s Resp. and Cross-Mot. for Summary J. (Def.'s MSJ), ECF No. 50; Pl.'s MSJ Reply, ECF No. 53; Def.'s MSJ Reply, ECF No. 54.  Plaintiff also renewed his motion for class certification, Pl.'s Renewed Mot. to Certify Class (Pl's Renewed Mot.), ECF No. 45, and defendant filed a motion to dismiss those of plaintiff's claims that fall outside of the six-year limitations period, Def.'s Mot. to Partially Dismiss (Def.'s Mot. to Dismiss), ECF No. 48.  See also Def.'s Resp. to Pl.'s Mot. (Def.'s Resp.), ECF No. 49; Pl.'s Reply, ECF No. 52; Pl.'s Resp. to Def.'s Mot. (Pl.'s Resp.), ECF No. 51; Def.'s Reply, ECF No. 55.  The court ordered supplemental briefing, and heard oral argument on May 24, 2016.  Pl.'s Supp'l Br., ECF No. 59; Def's Supp'l Br. & Resp. (Def.'s Supp'l Br.), ECF No. 64; Pl.'s Supp'l Reply, ECF No. 65; Hr'g Tr. (Tr.), ECF No. 75.  The parties' motions are now ripe for decision.

The court considers, in turn, the motion to dismiss, the cross-motions for summary judgment, and the renewed motion for class certification.

II.     Defendant's Motion to Dismiss

Defendant argues that plaintiff's claims for Sunday premium pay based on work performed prior to October 28, 2005 are time-barred.  Def.'s Mot. to Dismiss 1. Defendant asserts that, pursuant to 28 U.S.C. § 2501, any claims that accrued more than six years before plaintiff filed his complaint must be dismissed. Def.'s Mot. to Dismiss 1.

Plaintiff disagrees.  Plaintiff asserts that the accrual suspension rule applies here. Plaintiff argues that the limitations period for his claims must be suspended because defendant concealed the information necessary for him – and the proposed class – to bring their Sunday premium pay claims.  Pl.'s Resp. on Mot. to Dismiss 1, ECF No. 51.

A.     Legal Standards

Pursuant to the Tucker Act, codified at 28 U.S.C. § 1491(a)(l), the court has jurisdiction, in pertinent part, "to render judgment upon any claim against the United States founded either upon… any Act of Congress or any regulation of an executive department… for liquidated or unliquidated damages."  To invoke the court's jurisdiction, plaintiff must show that his claim is based upon a statute or regulation that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained."  United States v. Mitchell, 463 U.S. 206, 216-17 (1983) (quoting United States v. Testan, 424 U.S. 392, 400 (1976)).  Plaintiff has the burden of establishing the court's jurisdiction.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . . is properly raised by a [Rule] 12(b)(1) motion."  Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999); see also RCFC 12(b)(1) (allowing a party to assert, by motion, the "lack of subject-matter jurisdiction"). When such a motion is filed, the party seeking to invoke the court's jurisdiction has the burden of proof, McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936), and the burden is one of preponderant evidence, Reynolds, 846 F.2d at 748 (citing Zunamon v. Brown, 418 F.2d 883, 886 (8th Cir. 1969) (in turn quoting McNutt, 298 U.S. at 189)).

When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations [of the complaint] to be true and to draw all reasonable inferences in plaintiff's favor."  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  "If a motion to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute."  Reynolds, 846 F.2d at 747.

The United States Supreme Court has held that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157–58 (Fed. Cir. 2014) (quoting Iqbal, 556 U.S. at 678) ("A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable.  If the plaintiff fails to include such allegations in his complaint, it is deficient.") (citation omitted).

A plaintiff seeking to establish jurisdiction in this court under the Tucker Act also must show that his or her claim accrued within six years of the date upon which the action is filed.  See 28 U.S.C. § 2501 (2012); John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133–35 (2008) (providing that the six-year limitations period is an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a dispute).  Before addressing the merits, the "court must satisfy itself that it has jurisdiction to hear and decide a case."  Hardie v. United States, 367 F.3d 1288, 1290 (Fed. Cir. 2004) (quoting PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1241 (Fed. Cir. 2002) (in turn citing View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997))).  The six-year statute of limitations set forth in 28 U.S.C. § 2501 "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed."  Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988); see also Kirby v. United States, 201 Ct. Cl. 527, 1973 WL 21341 (1973).  "Because the statute of limitations affects this court's subject matter jurisdiction—rather than being an affirmative defense—the requirement is strictly construed and under no circumstances may it be waived by the court."  Martinez v. United States, 48 Fed. Cl. 851, 857 (2001) (citing Laughlin v. United States, 22 Cl. Ct. 85, 99 (1990), aff'd, 975 F.2d 869 (Fed. Cir. 1992)); FloorPro, Inc. v. United States, 680 F.3d 1377, 1380-81 (Fed. Cir. 2012) (holding that the limitations period imposed by section 2501 is "jurisdictional, and may not be waived or tolled"); see also Alder Terrace Inc. v. United States, 161 F.3d 1372, 1376–77 (Fed. Cir. 1998); Hart v. United States, 910 F.2d 815, 817 (Fed. Cir. 1990).

It is well settled that a "claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994) (quoting Japanese War Notes Claimants Ass'n v. United States, 373 F.2d 356, 358 (Ct. Cl. 1967)); Patton v. United States, 64 Fed. Cl. 768, 774 (2005) (quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988)).  "A claim does not accrue, however, 'unless the claimant knew or should have known that the claim existed.'"  Id. (quoting Kinsey, 852 F.2d at 557 n.*); see also Banks v. United States, 741 F.3d 1268, 1279–80 (Fed. Cir. 2014) ("The accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed ('the accrual suspension rule')."  "Alternatively [stated], '[a] claim accrues when damages are ascertainable.'"

9

Patton, 64 Fed. Cl. at 774 (quoting Shermco Indus., Inc. v. United States, 6 Cl. Ct. 588, 591 (1984)).

"This court has long adhered to the view that a suit for compensation due and payable periodically is, by its very nature, a 'continuing claim' which involves multiple causes of action, each [claim] arising at the time the Government fails to make the payment alleged to be due." Acker v. United States, 23 Cl. Ct. 803, 804 (1991) (quoting Burich v. United States, 366 F.2d 984, 986 (Ct. Cl. 1966), cert. denied, 389 U.S. 885 (1967)). When considering statutory claims for back pay, the court has applied the continuing claim doctrine so that periodic pay claims – which accrue more than six years prior to filing a claim with the court – are not time-barred. Friedman v. United States, 310 F.2d 381, 384 (Ct. Cl. 1962). "[T]he cause of action accrues upon completion of the work for which recovery is sought[.]" Burich, 366 F.2d at 986. Thus, a plaintiff asserting a continuing claim is "entitled to recover the allowances accrued during the six years immediately preceding the filing of suit, even if the claims originally arose more than six years before." Acker, 23 Cl. Ct. at 804 (citation omitted).

In certain circumstances, the accrual suspension rule operates to suspend the six year statute of limitations period. The rule applies if "the claimant '… either show[s] that the defendant… concealed its acts with the result that plaintiff was unaware of their existence or… show[s] that its injury was 'inherently unknowable' at the accrual date.'" Banks, 741 F.3d at 1280 (quoting Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (quoting Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)). Accrual suspension is appropriate "only where [a plantiff's] due diligence would not have prompted discovery" at an earlier date. Patton, 64 Fed. Cl. at 776. The court has noted that "absent active concealment by defendant, accrual suspension requires what is tantamount to sheer impossibility of notice." Rosales v. United States, 89 Fed. Cl. 565, 578 (2009).

Upon finding, at any time, that it does not have jurisdiction over a case, the court must dismiss it. RCFC 12(h)(3).

B.    The Parties' Positions

Defendant asserts that plaintiff has alleged a continuing claim in his October 28, 2011 complaint. Def.'s Mot. to Dismiss 6 (citing 28 U.S.C. § 2501). Defendant contends that the statute of limitations bars those of plaintiff's claims that precede October 28, 2005, the date six years prior to the filing of his complaint with the court. Id.

To support its position, defendant argues that plaintiff cannot characterize the Federal Circuit's decision in Fathauer as an "administrative determination" under the Back Pay Act, 5 U.S.C. § 5596(b)(4) – and thereby bring claims for the six year period preceding the issuance of Fathauer – because the court has previously found that the Back

Pay Act does not extend the statute of limitations.  Def.'s Mot. to Dismiss 6 n.3 (citing Jones v. United States, 113 Fed. Cl. 39, 42 (2013); Wilder v. United States, 277 Fed. Appx. 999, 999-1000 (Fed. Cir. 2008) (affirming dismissal of plaintiff's Back Pay Act claims as barred by section 2501)).  Defendant adds that equitable tolling is not available for actions brought under the Tucker Act.  Id. at 7 (citing John R. Sand & Gravel, 552 U.S. at 133-34; Young, 529 F.3d at 1384; Banks, 102 Fed. Cl. at 143).

Defendant acknowledges that under the "accrual suspension" rule, claims may be excepted from the ordinary application of the statute of limitations.  But, defendant asserts, plaintiff here cannot meet the "strictly and narrowly applied" requirements for the accrual suspension rule to apply.  Id. at 7-8.  Specifically, plaintiff cannot show that either: (1) defendant "concealed its acts with the result that [plaintiff was] unaware of their existence", or (2) the alleged injuries plaintiff suffered were "inherently unknowable at the accrual date[s]."  Id. (citing Banks, 102 Fed. Cl. at 143).  Defendant insists that the government acted openly by paying plaintiff his regular rate for Sunday work without premium pay and thus, put plaintiff on notice of his injury.  Id. at 8 (citing Webster v. United States, 90 Fed. Cl. 107, 115 (2009)).  Defendant adds that plaintiff cannot establish that his injuries were inherently unknowable at the time they accrued because the accrual suspension rule applies only to the concealment of the relevant facts and not to any failure to draw to plaintiff's attention the legal basis for a potential claim.  Id. at 8-9 (citing Banks, 102 Fed. Cl. at 144; Young, 529 F.3d at 1385; Venture Coal Sales Co. v. United States, 57 Fed. Cl. 52, 54 (2003) (observing that a "statute's effect and objective meaning are fixed when the statute is adopted, not when it is first construed by a court.")); Def.'s Reply 1-2 (citing Menominee Tribe of Indians v. United States, 726 F.2d 718, 720–21 (Fed. Cir. 1984).

Plaintiff responds that because defendant failed to alert him and the proposed class of their eligibility for Sunday premium pay, as the OPM and the DOC's OHRM had directed, the accrual suspension rule does apply.  Pl.'s Resp. 12, 14, 15-16; see Jt. Stip. ¶70.  Plaintiff maintains that as a result of defendant's failure to act as charged, his injuries were not discoverable until he "fortuitously learned of the operative facts through a Telephone Center employee."  Id. 17.

Plaintiff challenges the cases upon which defendant relies because they do not involve allegations of the government actively concealing information.  Id. at 17-18.  Plaintiff asserts that "[d]efendant concealed the very facts that would have made [p]laintiff and the [Field Representatives] aware of the existence of [their] claim for Sunday premium pay."  Id. at 21.  Specifically, defendant failed to alert plaintiff of: (1) the extension of Sunday premium pay to part-time employees under Fathauer; (2) the procedure for submitting an administrative claim; and (3) any determination, if made by the Census Bureau, that part-time Field Representatives are ineligible for Sunday premium pay.  Plaintiff adds that any limitation of his claim to the six years prior to the

filing of his complaint would permit the Census Bureau to profit from its acts of concealment.  Id.

C.    Discussion

Plaintiff's proposed application of the accrual suspension rule – to preserve his claim for the six year period prior to the date of the Fathauer decision – appears to be a novel one.  See Pl.'s Resp. 17-18.  Plaintiff endeavors to invoke the accrual suspension rule to extend the statute of limitations for his claims at the same time that he is benefitting from the application of the continuing claim exception to preserve his claim.  But plaintiff points to no authority – and the court is aware of none – that supports the application of the accrual suspension rule to expand the statutory six year period of recovery for a continuing claim.

Effectively, plaintiff asserts that his claim was inherently unknowable before the issuance of the Fathauer decision and that defendant concealed the claim thereafter.  Pl.'s Resp. on Mot. to Dismiss 22 ("[A]bsent notice, [plaintiff] would never have known of the existence of [his] claims or [his] injury or had the factual information necessary for purposes of filing such a claim.").  The record does show that the Census Bureau failed to make available to the Field Representatives information concerning the administrative claim process for Sunday premium pay.  Jt. Stip. ¶70; see also section I(D), supra.  Plaintiff assumes incorrectly, however, that prior to the Fathauer decision, his claim was inherently unknowable.  See Japanese War Notes Claimants, 373 F.2d at 359 ("An example of [an inherently unknowable injury] would be when defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit."); Roberts v. United States, 312 Fed. Appx. 340, 342 (Fed. Cir. 2009) (affirming the dismissal of plaintiffs' claims as untimely under § 2501, where plaintiff failed to demonstrate that his military service records were wholly unavailable).

The plaintiffs in Fathauer were meteorologists who worked part-time with the National Weather Service.  They brought suit against the United States claiming entitlement to Sunday premium pay.  Fathauer, 566 F.3d 1352.  Like the meteorologists in Fathauer, plaintiff is a part-time federal employee who worked on Sundays without premium pay, and like the meteorologists in Fathauer, plaintiff also could have filed an action.  Plaintiff need not have waited for defendant to alert him that such an action could have been brought or that such an action might be successful.

Plaintiff's effort to key the accrual of his claim to the timing of the Federal Circuit's decision is similar to an effort made by the plaintiff in RAM Energy, Inc. v. United States, 94 Fed. Cl. 406, 412 (2010).  In that case, the complainant argued that the accrual suspension rule applied because "the underlying basis for the claim [wasn't] known (or [couldn't] be known) until there [was] first a legal determination establishing the claimant's rights," as had occurred in the earlier Neely case.  Id. (citing Neely v.

United States, 546 F.2d 1059 (3d Cir. 1976).  The court disagreed because the Third Circuit's decision in the Neely case cited by plaintiff was readily distinguishable.  The court observed that the claimants in Neely had no legal right to bring suit until the Supreme Court reversed the adverse precedent in the Third Circuit, and thus their claim was deemed inherently unknowable.  Id.

As in Ram Energy, this case is different from the circumstance in Neely.  The Federal Circuit's interpretation of the Sunday premium pay statute in Fathauer did not create a legal claim for plaintiff.  As this court previously stated, "a statute's effect and objective meaning are fixed when the statute is adopted, not when it is first construed by a court."  Venture Coal Sales Co., 57 Fed. Cl. at 54.  Thus, "[c]ases such as Neely are readily distinguishable from those in which the facts are known, but the legal implications are not."  Petro-Hunt, L.L.C. v. United States, 90 Fed. Cl. 51, 62 (2009).

Because plaintiff could have asserted his claim as the plaintiffs in Fathauer did, his claim did not accrue when the Federal Circuit issued its decision.  Patton, 64 Fed. Cl. at 776; Banks, 102 Fed. Cl. at 144; Young, 529 F.3d at 1385.  Rather, it accrued, and continues to accrue, each pay period plaintiff performs work on a Sunday without receiving Sunday premium pay.

The accrual date of plaintiff's claim does not warrant suspension, and the statute of limitations applies to bar those claims that fall outside the six year period prior to filing of plaintiff's complaint.  28 U.S.C. § 2501.  Defendant's motion for partial dismissal is **GRANTED**.  Plaintiff's claims for Sunday premium pay that pre-date October 28, 2005 are **DISMISSED**.

III.    The Parties' Cross-Motions for Summary Judgment

The parties have filed cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).[1]  In their cross-motions for summary judgment, the parties present their competing views on what constitutes "a regularly scheduled 8-hour period of service."

---

[1]    The Rules of the United States Court of Federal Claims generally mirror the Federal Rules of Civil Procedure (FRCP).  See RCFC 56 rules committee note (2008 amendment) ("The language of RCFC 56 has been amended to conform to the general restyling of the FRCP."); C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1541 n.2 (Fed. Cir. 1993) ("The [RCFC] generally follow the [FRCP].  [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Accordingly, the court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

A. Legal Standards

1. Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson 477 U.S. 247–48 (emphasis omitted).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Each party carries its burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swish, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").

14

Summary judgment must enter against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  But, if neither party satisfies its burden on cross-motions for summary judgment, then the court must deny both motions.  See, e.g., Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 723 (2009); Dick Pac./GHEMM, JV v. United States, 87 Fed. Cl. 113, 126 (2009); Whalen v. United States, 93 Fed. Cl. 579, 587 (2010) ("Denial of both motions is warranted if genuine disputes exist over material facts.") (citing Mingus Constructors, Inc., 812 F.2d 1391).

Because the parties have developed an extensive factual record over the long pendency of this case, the outstanding issues are primarily legal in nature.  Thus, summary judgment is appropriate, and to the extent any factual disagreements remain, the court finds them to be immaterial.

        2.       Statutory Interpretation

Pursuant to the rules of statutory construction,  "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc. (Chevron), 467 U.S. 837, 842-43 (1984).  Where "the statutory language is plain" the court "must enforce it according to its terms."  King v. Burwell, 135 S. Ct. 2480, 2489 (2015).

 However, if statutory language contains an ambiguity, the court must examine the textual context of the language as well as the legislative history of the statute.  Star-Glo Assocs., LP v. United States, 414 F.3d 1349, 1356 (Fed. Cir. 2005).  Moreover, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron 467 U.S. at 843.  These "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  Id. at 844; see also id. at 843 n.11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.").

        B.      Discussion

Under the Sunday premium pay statute, a federal "employee who performs work during a regularly scheduled 8-hour period of service which is not overtime work . . . a part of which is performed on a Sunday is entitled to" Sunday premium pay.  5 U.S.C. § 5546(a).  In Fathauer, the Federal Circuit found that the term "employee" pertains to both full-time and part-time employees.  566 F.3d at 1353, 1357.  The appellate court was silent, however, as to what constitutes "work during a regularly scheduled 8-hour period of service."  See id. at 1357-58 (Dyk, J., concurring).  Thus, whether plaintiff is entitled

to Sunday premium pay turns on whether he performs work "during a regularly scheduled 8-hour period of service… " 5 U.S.C. § 5546(a) (emphasis added).

### 1.     The Parties' Positions

The parties do not dispute the meaning of the term "8 hour period of service."  The parties agree that it includes any duration of work not exceeding 8 hours (and thus, triggering overtime).  Def.'s Supp'l Br. 3; Tr. 82, 86; Pl.'s Supp'l Br. 3-4.  The parties disagree, however, as to what the term "regularly scheduled" means.  The court in Fathauer did not "address the 'regularly scheduled' language in § 5546(a)," and thus left unresolved the issue of whether part-time employees – who are assigned work with a fixed deadline but set their own hours – could be deemed "regularly scheduled." Fathauer, 566 F.3d at 1357-58.

Defendant asserts that the term should be narrowly construed.  To that end, defendant argues that employees who set their own schedules – such as plaintiff and other Field Representatives – cannot be deemed to be working "regularly scheduled" hours. Def.'s MSJ 9-11.  Defendant contends that plaintiff's claim must fail because the work performed was not scheduled in advance by a supervisor on a routine basis.  Id.; Tr. 44 (defendant arguing that work scheduled in advance by a supervisor is not enough; rather, it must be scheduled "regularly."); Def.'s MSJ Reply 2.

Plaintiff challenges defendant's claim that the Sunday premium pay statute requires that a supervisor prepare a schedule of the exact days and hours that an employee is expected to work.  Plaintiff responds that defendant seeks to interpret the statute in a manner that is contrary to the plain meaning of the phrase "regularly scheduled."  Pl.'s MSJ 28.  Instead, plaintiff argues, the term "regularly scheduled" should be read more broadly to apply to all part-time Field Representatives whose work necessitates Sunday hours.  Pl.'s MSJ 6-7; Tr. 33-35; Pl.'s Supp'l Br. 13.

Plaintiff bases his argument on his designated work status – and that of the proposed class member of Field Representatives – as an employee with a part-time schedule rather than an intermittent schedule.  Pl.'s MSJ 5-7.  Plaintiff observes that an employee's part-time status is determined by the Census Bureau, not the employee.  Id. at 7.  Plaintiff adds that an employee can become eligible for part-time work status only after establishing a regular pattern of work from pay period to pay period.  Id.  Although employees hired as Field Representatives are "mixed tour" employees who may work as either intermittent, part-time, or full-time employees, there are clear criteria for the conversion of an employee from an intermittent to a part-time work schedule.  Id.  For such conversion, an employee must "establish a pattern of working more than 240 hours per quarter" and the employee is expected to continue to do so.  Id.  Plaintiff argues that this established pattern qualifies both himself and the proposed class members as

"regularly scheduled" and renders them eligible to receive Sunday premium pay.  Id. at 6 -8 (citing Jt. Facts at 15-17; Traub Ex. 4).

Plaintiff contends that OPM regulations require this finding because, according to the pertinent regulation 5 C.F.R. § 610.111, only intermittent employees have irregular schedules.  Tr. 33-35; Pl.'s Supp'l Br. 13.  Plaintiff explains that part-time Field Representatives are identified readily once they convert from intermittent status by the issuance of a new Standard Form 50 documenting their work status as "part-time."  Pl.'s MSJ 7.

The court turns first to examine the text of the Sunday premium pay statute.  See Lamie v. Trustee, 540 U.S. 526, 534 (2004); Indian Harbor Ins. Co. v. United States, 704 F.3d 949, 954 (Fed. Cir. 2013).

### 2.  The Phrase "Regularly Scheduled" Within the Sunday Premium Pay Statute Is Not Ambiguous

The phrase "during a regularly scheduled 8-hour period of service" is not defined in either the Sunday premium pay statute or any other statute relating to premium pay.  See 5 U.S.C. §§ 5541-5550b.  Nor has the phrase been construed in the case law.

This court, however, has touched previously and lightly on the issue of the scheduling requirements for Sunday premium pay when it found in Doe v. United States that holiday pay, another type of premium pay, could not be "scheduled" by mere knowledge, encouragement, or inducement.  See Doe v. United States, 63 Fed. Cl. 798, 802 (2005), aff'd, 463 F.3d 1314 (Fed. Cir. 2006), cert. denied, 549 U.S. 1321 (2007).  In Doe, the plaintiffs moved for reconsideration of a judgment mandated by the Federal Circuit following a reversal of the court's summary judgment decision.  In their motion for reconsideration, the plaintiffs reasserted their claim for holiday pay arguing that the issue had not been addressed on appeal.  The plaintiffs further asserted that the outcome of the appeal created a change in the law that permitted the reopening of their claim for overtime pay, yet another type of premium pay.

The court in Doe denied plaintiffs' motion stating that the law of the case doctrine precluded further consideration of plaintiffs' alternative arguments as to overtime pay, and that the Federal Circuit's ruling on interlocutory appeal controlled – by necessary implication – plaintiffs' claim to holiday pay.  Id.  The court also cursorily mentioned the need for scheduling to trigger Sunday premium pay.  Id. at 801-02.  Without construing the language of the Sunday premium pay statute, the court reached its conclusion in part based on the fact that plaintiffs had made no claim that they were scheduled to work either on Sundays or on holidays.  Thus, the court determined that plaintiffs' claim to premium pay in general – based on knowledge, encouragement, and inducement – was precluded by the law of the case doctrine.  The Federal Circuit affirmed the finding that

plaintiffs were foreclosed from raising alternative arguments for overtime or holiday pay without addressing the scheduling requirements of the Sunday premium pay statute. <u>Doe</u>, 463 F.3d at 1314.

The factual circumstances before this court now are different from that in <u>Doe</u> because plaintiff claims that he was regularly scheduled to perform work on Sundays. Pl.'s MSJ 5-7. Furthermore, plaintiff and the members of the proposed class already receive other premium pay – including a night pay differential for their self-scheduled hours worked after 6:00 P.M. Jt. Stip. ¶ 22 (part-time Field Representatives are eligible for overtime, night, and holiday premium pay); Tr. 35, 42-43. As such, the <u>Doe</u> cases do not appear to be dispositive of the issue presented here.

When construing the term "employee" in the Sunday premium pay statute, the Federal Circuit in <u>Fathauer</u> suggested that the phrase "regularly scheduled" could be understood to be a "normal" schedule of a traditional five-day work week, but could also refer to a varying part-time work week. <u>Fathauer</u>, 566 F.3d at 1357 (Dyk, J., concurring). The observation that the phrase "regularly scheduled" could be ambiguous was made in the particular context of determining whether part-time employees are covered employees under the Sunday premium pay statute. <u>Id</u>; <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning <u>with regard to the particular dispute</u> in the case" (emphasis added)) (citing <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505 U.S. 469, 477 (1992); <u>McCarthy v. Bronson</u>, 500 U.S. 136, 139 (1991)). Bound by the findings in <u>Fathauer</u>, the court now considers a different question, that is – whether part-time Field Representatives are deemed "regularly scheduled" under the statute and are thus eligible to receive Sunday premium pay.

To resolve this issue, the court turns to consider "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute" in this case. <u>Robinson</u>, 519 U.S. at 340. "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" <u>Lamie</u>, 540 U.S. at 534 (quoting <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.</u>, 530 U.S. 1, 6 (2000) (internal quotations omitted)). In determining the meaning of statutory language, the court looks to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. <u>Robinson</u>, 519 U.S. at 341.

The court's examination of several common dictionaries returned a number of redundant plain meaning definitions for the terms "regularly" and "scheduled." <u>See</u> <u>The American Heritage Dictionary of the English Language</u> 1471, 1557 (4th ed. 2000) (regular: "customary, usual, or normal," "occurring with normal [] frequency;" schedule: "[a] plan for performing work or achieving an objective, specifying the order and allotted time for each part" or "[t]o plan or appoint for a certain time or date"); <u>Oxford English</u>

Dictionary vol. 8 524, 613 (2d ed. 1989) (regularly: "at the proper times; at fixed times or intervals; without interruption of recurrence; constantly" or "in the usual or customary manner;" scheduled: "to place (something) on a programme of future events; to arrange for a (person or thing) to do something or for an event"); Webster's Third New International Dictionary 1913, 2028 (2002) (regularly: "[i]n a regular, orderly, lawful, or methodical way;" scheduled: "[t]o appoint, assign, or designate to do or receive something at a fixed time in the future").  Based on a consensus of these definitions, the court construes the phrase "regularly scheduled" to mean the usual plan for performing work within a set time frame.

But, the court does not look solely to the dictionary definitions of the component terms of the phrase.  Yates v. United States, 135 S. Ct. 1074, 1081-82 (2015).  The court also considers the plain meaning of the phrase "regularly scheduled" in the particular context of the Sunday premium pay statute.  Id.  The court finds that the plain meaning of that phrase – as informed by the dictionary definitions of the component terms – is not disturbed in the context of the relevant statutory scheme.  Nor do the words in the statute immediately following the phrase "regularly scheduled" alter the court's interpretation.  Although an "8-hour period of service" refers to a specific length of time, that phrase has been construed to apply to any amount of time worked that is not overtime.  Fathauer, 566 F.3d at 1354 (citing Fathauer, 82 Fed. Cl. at 513); Def.'s Supp'l Br. 3; Tr. 82, 86; Pl.'s Supp'l Br. 3-4.  As such, a "regularly scheduled 8-hour period of service" construed in the context of the Sunday premium pay statute pertains to the usual plan for performing work – that is not overtime – within a set time period.

Contrary to defendant's assertions, the plain language of the statute does not restrict the act of scheduling work to supervisors only.  Def.'s MSJ 9-11.  Although there are varying permutations in the dictionary definitions for the phrase "regularly scheduled," there is nothing in any of the examined definitions for the word "scheduled" that requires particular dates and times to be established by a particular person.  Instead, the term "scheduled" speaks only to work that has been arranged, organized or planned to occur.  It does not speak to particular dates or times that must be arranged; nor does it speak to who is expected to do the arranging.  As the term "scheduled" is modified by the adverb "regularly," it contemplates work that is "customarily" or "usually" arranged, organized, or planned.  Thus, the phrase "regularly scheduled" allows that a supervisor may establish work expectations by day and hour – as defendant contends.  But, it also allows a supervisor to assign work routinely to be performed within a certain time period – such as on a project-by-deadline basis – by an employee who in turn establishes the days and hours for project completion, as plaintiff contends.

That the statute does not provide specifics on how detailed a schedule must be, or who must establish it, to be deemed "regularly scheduled" does not render the statute ambiguous, but renders it broad.  PGA Tour, Inc. v. Martin, 532 U.S. 661, 689 (2001) ("[T]he fact that a statute can be applied in situations not expressly anticipated by

19

Congress does not demonstrate ambiguity.  It demonstrates breadth.") (citing Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 212, (1998)).  As the Supreme Court has observed, "broad general language is not necessarily ambiguous when congressional objectives require broad terms."  Diamond v. Chakrabarty, 447 U.S. 303, 315 (1980) (noting the frequency with which the Court has observed that statutes are not confined to "particular application[s] . . . contemplated by the legislators" (quoting Barr v. United States, 324 U.S. 83 (1945)).

Insisting that only those employees whose specific hours are set in advance by a supervisor can meet the statutory requirement of "regularly scheduled," defendant effectively seeks to import the "officially ordered or approved" standard from the overtime premium pay statute into the Sunday premium pay statute.  5 U.S.C.A. § 5542(a); Def.'s MSJ Reply 2.  But "there is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted."  Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978).  Without the limiting language that Congress used in other sections of the premium pay statutes in the statutory section now under examination, the court does not infer that the same limitations apply.  Jama v. Immigration & Customs Enf't, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").  More specifically, because Congress did not include in the Sunday premium pay statute that same restrictive language that is part of the overtime premium pay statute, the court does not construe the "regularly scheduled" language as it must construe the "officially ordered or approved" language.  Compare 5 U.S.C.A. § 5546, with 5 U.S.C.A. § 5542(a); Doe, 463 F.3d 1314.

As it looks at the statutory scheme as a whole, the court notes that the federal premium pay statutes include various tailored requirements for specific agencies and certain types of employees.  See 5 U.S.C.A. §§ 5545a (criminal investigators), 5545b (firefighters), 5546a (Federal Aviation Administration and the Department of Defense).  In contrast, the Sunday premium pay section of the statute is broad in its language and thus, its potential applicability to the workforce, 5 U.S.C.A. § 5546.  The comparatively unrestricted language of the Sunday premium pay statute leaves room for a variety of staffing possibilities that could satisfy the "regularly scheduled" statutory requirement.  PGA Tour, Inc., 532 U.S. at 689.

Having determined that the statutory language "regularly scheduled" is broad and not ambiguous, the court's inquiry must not go further than the statute, but end here.  King, 135 S. Ct. at 2489; Demarest v. Manspeaker, 498 U.S. 184, 190 (1991) (citing Burlington Northern R. Co. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461(1987); Rubin v. United States, 449 U.S. 424, 430 (1981); TVA v. Hill, 437 U.S. 153, 187 (1978); quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571(1982)) ("When we find

the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances … where the application of the statute as written will produce a result 'demonstrably at odds with the intentions of its drafters.'"). The court considers next whether plaintiff and the proposed class satisfy the "regularly scheduled" requirement of the statute.

3.    Part-time Field Representatives Are "Regularly Scheduled"

The court understands that to be designated as part-time Field Representatives, employees must have demonstrated a predictable pattern of hours worked and a sustained practice of satisfactory performance to have been converted to – and to continue to work on – a part-time schedule. Jt. Stip. ¶ 17. While working a part-time schedule, plaintiff and the proposed class members have received, as a matter of routine, surveys that must be completed prior to established deadlines. Jt. Stip. ¶¶ 16, 26. Plaintiff and the proposed class members are normally assigned work in advance of the work week but may set their own hourly schedules to complete their work. This is the usual and customary way of arranging their work.

The successful completion of that work typically involves working Sunday hours. Jt. Stip. ¶¶ 28-40; Traub Ex. 33. Defendant posits that – even if Field Representatives are scheduled sporadically to work on Sundays – such instances still do not meet the "regularly" test. Tr. 44 (Defendant argues that work scheduled in advance by a supervisor is not enough; rather, it must be scheduled "regularly."); Def.'s MSJ Reply 2. But defendant misses the mark here. Many routine aspects of a Field Representative's position involve Sunday work. Jt. Stip. ¶¶ 28-40; Traub Ex. 33 (Historically, 19% of the CPS survey is completed on the first and second Sunday of CPS week). And the Federal Circuit has found that the term "regularly scheduled" – as used in the Sunday premium pay statute – does not "require[e] scheduling on every single Sunday of each month… [r]ather, all that ["regularly scheduled"] requires is that the scheduling be 'regular' as opposed to intermittent." Armitage v. United States, 991 F.2d 746, 751 (Fed. Cir. 1993).

By performing their required nonovertime work as described, part-time Field Representatives routinely complete their work within the time period fixed by the Census Bureau. The court finds that this manner of setting hours and working is sufficient to bring part-time Field Representatives within the ambit of "regularly scheduled" as contemplated by the plain meaning of the statute and to render them eligible for Sunday premium pay. Lamie, 540 U.S. at 534. This finding applies to plaintiff and to other part-time Field Representatives who performed Sunday work.

Plaintiff's motion for summary judgment is **GRANTED**. Defendant's cross-motion for summary judgment is **DENIED**. Part-time Field Representatives are eligible

to receive Sunday premium pay for the period of October 28, 2005 to the present and going forward.

IV.     Class Certification

      A.      Legal Standards

      The court addressed the requirements to certify a class when plaintiff first moved to do so in 2012.[2]  Gross v. United States, 106 Fed. Cl. 369 (2012).  For the sake of completeness, the court reviews the requirements here.

      Pursuant to RCFC 23(a), one or more members of a class may sue as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

RCFC 23(a)(1)-(4).

      A class action may be maintained if RCFC 23(a) is satisfied and if:

> (1) [not used]; (2) the United States has acted or refused to act on grounds generally applicable to the class; and (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy begun by class members; (C) [not used]; and (D) the likely difficulties in managing a class action.

---

[2]     Plaintiff sought to bring a class action pursuant to RCFC 23.  Gross v. United States, 106 Fed. Cl. 369 (2012).  However, plaintiff was unable to meet all of the requirements set forth in RCFC 23, specifically the numerosity and superiority requirements.  Id. at 385.  Additionally, plaintiff failed to satisfy the elements of commonality and adequacy of representation.  Id.

RCFC 23(b)(1)-(3). The requirements of RCFC 23 have been described more concisely as: (i) numerosity, (ii) commonality, (iii) typicality, (iv) adequacy, and (v) superiority. Barnes v. United States, 68 Fed. Cl. 492, 494 (2005).

The proponent of a class action must satisfy each of the requirements by a preponderance of the evidence. Bell v. United States, 123 Fed. Cl. 390, 395 (2015); see also Gross, 106 Fed. Cl. at 373 (citing Messner v. Northshore Univ. Health Sys., 669 F.3d 802, 811 (7th Cir. 2012)). Because the "requirements are in the conjunctive," the "failure to satisfy any one of them is fatal to class certification." Barnes, 68 Fed. Cl. at 494.

B.     Discussion

Informed by its earlier decision denying plaintiff's motion for class certification, the court considers whether plaintiff satisfies the requirements for class certification. When the court first addressed this issue in 2012, it found a deficiency in plaintiff's proposed class definition:

> The definition fashioned by plaintiff is self-executing–it implies that individuals who opt into the class have already satisfied all of the requirements of the Sunday premium pay statute and leaves no room for doubt that those individuals are entitled to join the class and are entitled to recovery. However, satisfaction of the statutory requirements is an issue that the court must decide during proceedings on the merits, not during the initial stage of class certification.

Gross, 106 Fed. Cl. at 373-74.

Thus, the court exercised its discretion and modified the proposed class definition to include all "part-time Field Representatives and Senior Field Representatives employed by the Census Bureau from May 26, 2003, to the present who performed nonovertime work on a Sunday and did not receive Sunday premium pay for that work under 5 U.S.C. § 5546(a)." Id. at 374; but see amended definition section II.C, supra (changing accrual date from May 26, 2003 to October 28, 2005). The court then analyzed whether plaintiff had met the requirements for maintaining a class action. Id. at 373 (citations omitted). The court concluded that plaintiff had not satisfied the numerosity requirement, the superiority requirement, the predominance component of the commonality requirement, and the second element of the adequacy requirement.[4]

---

[4]     The court opined that plaintiff likely would satisfy the numerosity and adequacy requirements upon renewing the motion for class certification. Gross, 106 Fed. Cl. at 377 n.6, 383 n.12.

Plaintiff has renewed his motion for class certification and has addressed each RCFC 23 requirement that the court initially found not to have been met.  Pl.'s Renewed Mot.  Defendant opposes plaintiff's renewed motion to certify a class based on its interpretation of "a regularly scheduled 8-hour period of service."  Def.'s Opp'n.

The court has interpreted the phrase "a regularly scheduled 8-hour period of service" in the context of the parties' summary judgment briefing in plaintiff's favor.  See section III infra.  Thus, the court turns now to evaluate whether plaintiff presently satisfies the requirements that he did not when he first sought class certification.

      1.     Numerosity

To prevail on his motion for class certification, plaintiff must satisfy the numerosity requirement.  RCFC 23(a)(1) specifies that a class action is appropriate only if "the class is so numerous that joinder of all members is impracticable[.]"  There is no set number of potential class members that must exist before a court can certify a class.  Instead, the court must look to the facts of the case.  Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980).  In particular, the court must consider the number of potential class members, the geographic dispersal of the potential class members, and the size of each potential class member's claim.  King v. United States, 84 Fed. Cl. 120, 123–24 (2015); accord Jaynes v. United States, 69 Fed. Cl. 450, 454 (2006).

The court earlier found that plaintiff had not satisfied this requirement because he had no "reliable estimate of the number of individuals who might become members of plaintiff's proposed class," and the court could not determine "whether the number of proposed class members [was] sufficiently numerous to render joinder impracticable."  Gross, 106 Fed. Cl. at 377.

The number of potential class members is viewed as the most important factor of the numerosity requirement.  Id.; see generally 5 Moore, supra, at ¶ 23.22[1][b].  While a putative class representative need not provide the precise number of prospective class members, speculation will not suffice.  King, 84 Fed. Cl. at 124 (a potential class of greater than 40 individuals generally will meet the first prong of RCFC 23(a)).  Plaintiff, through discovery, has established that there are more than 3,000 potential class members.  Pl.'s Renewed Mot. 26.  The potential class members are numerous.

Also bearing on numerosity – and, thus, the impracticability of joinder – is the location of the potential class members.  Joinder is less practicable when potential class members are dispersed geographically.  Id. at 124–25.  The court previously noted that the geographic dispersal of the potential class members made joinder less practicable.  Gross, 106 Fed. Cl. at 377.  Plaintiff now has established that the potential class members are located in several regions across the country.  Indeed, joinder of such a large, geographically widespread group of claims would not be practical.

When plaintiff first moved for certification, the court noted that plaintiff had not presented any evidence regarding the size of the individual claims. Gross, 106 Fed. Cl. at 377. The size of prospective class members' individual claims is relevant to the numerosity inquiry because in circumstances where there are numerous prospective claimants with small claims, a class action allows those individuals to pursue their claims without incurring litigation costs that would overwhelm their potential recoveries. King, 84 Fed. Cl. at 125; cf. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997) (noting that although class certification is not prohibited when numerous potential class members have large claims, the current class action scheme is aimed at vindicating the rights of individuals with small claims). With more information after discovery, plaintiff indicates that the likely size of the individual claims is relatively small. Pl.'s Renewed Mot. 26. Using the highest yearly average individual claim of $608.00 and multiplying that by an average tenure of 3.75 years, plaintiff calculates an average yield of $2,280.00 per potential class member. As such, legal action by individual prospective plaintiffs would be economically impractical. Id. at 26-27.

The court finds that the number of proposed class members is sufficiently numerous and geographically dispersed to render joinder impracticable, and each potential class member's claim is too modest to pursue independently. Thus, the numerosity requirement is satisfied.

## 2.   Commonality: Predominance

A determination about commonality involves three inquiries: (1) whether there are factual or legal issues common to the proposed class, RCFC 23(a)(2); (2) whether there are common issues that predominate, RCFC 23(b)(3); and (3) whether the government acted or refused to act on grounds applicable to the entire proposed class, RCFC 23(b)(2). In analyzing whether the commonality requirement has been satisfied, "the court must, where necessary, look beyond the pleadings, and seek to develop an understanding of the relevant claims, defenses, facts and substantive law." Barnes, 68 Fed. Cl. at 494.

The court must identify a common legal issue and then determine whether that issue predominates over the issues that are not common to the class. This predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "is far more demanding" an inquiry than the initial common-issue question. Amchem Prods., Inc., 521 U.S. at 623–24. Common issues – which apply to each member of the class – are deemed to predominate over individual issues – for which each member of the class must present particular evidence – if such issues "are more substantial than the issues subject only to individualized proof." Jaynes, 69 Fed. Cl. at 457 (quoting Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)).

Plaintiff previously established two of the three components to show commonality. First, plaintiff showed that the potential class members shared a common legal issue: the determination of what constitutes a "regularly scheduled 8-hour period of service" under the Sunday premium pay statute. Gross, 106 Fed. Cl. at 378-79. Second, plaintiff showed that potential class members were treated similarly by the government. Id. at 380. However, plaintiff did not establish, to the court's satisfaction, the third component, specifically, that the common legal issue predominated over issues that were not common to the proposed class. Id. at 379-80. The court remarked:

> In this case, each putative class member must establish (1) what constitutes a "regularly scheduled 8-hour period of service"; (2) whether he or she performed nonovertime work on a Sunday after May 26, 2003, "during a regularly scheduled 8-hour period of service"; and (3) the amount of Sunday premium pay to which he or she is entitled. [R]esolution of the first issue can be accomplished on a classwide basis. However, it has yet to be determined whether generalized proof is sufficient to resolve the second issue. The types of proof necessary to establish whether a part-time field employee performed Sunday work "during a regularly scheduled 8-hour period of service" depends on how that phrase is defined; depending on the definition, the proposed class may rely on generalized evidence, or each part-time field employee may need to present individualized evidence based on his or her particular circumstances. In other words, the extent of the individualized inquiries that will be needed in this case is currently unknown.

Id. at 379.

But, the court found that plaintiff had satisfied the typicality requirement. The court stated that "the claims of each potential class member arise from the same course of action: the Census Bureau's failure to pay them Sunday premium pay" and that "all of the potential class members would make a similar legal argument regarding their entitlement to Sunday premium pay: that they performed nonovertime work on Sundays 'during a regularly scheduled 8-hour period of service . . .'" Gross, 106 Fed. Cl. at 381.

In support of his renewed motion, plaintiff asserts that the resolution of each putative class member's claim hinges upon one predominate question of law: the eligibility of part-time Field Representatives to receive Sunday premium pay. Pl.'s Renewed Mot. 30-32. Defendant responds that plaintiff cannot meet the predominance element of the commonality requirement because the "court would need to make numerous, fact-intensive individualized inquiries regarding whether each individual worked on each Sunday during a 'regularly scheduled period of work' taking into account their job title, their assigned regions and their assigned surveys." Def.'s Resp. 17.

The court now has found that the proposed class may rely on generalized evidence to prove whether part-time Field Representatives performed nonovertime work on a Sunday after May 26, 2003, "during a regularly scheduled 8-hour period of service."  See section III, supra.  Thus, an individualized inquiry into each class member's unique scheduling circumstances is not necessary.  The commonality requirement is satisfied because plaintiff has demonstrated that a common legal issue predominates over issues not common to the proposed class.

3.     Adequacy

In addition to establishing numerosity, commonality, and typicality, a putative class representative must establish that he or she will "fairly and adequately protect the interests of the class." RCFC 23(a)(4).  There are two components to the adequacy requirement.  The first involves an examination of whether conflicts exist between the putative class representative and the remainder of the proposed class; and the second involves an assessment of the qualifications and capabilities of proposed class counsel.  Amchem Prods., Inc., 521 U.S. at 625–26 & n. 20; Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 157 n. 13 (1982); E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 404–05 (1977).

With respect to the first component of the adequacy requirement, the court previously found that plaintiff had established that his interests were not in conflict with the interests of the other potential class members.  Gross, 106 Fed. Cl. at 381-82.  But, plaintiff failed – at that time – to satisfy the second component of the adequacy prong because he had not presented evidence about the size of – and the resources available to – the respective law firms of the proposed class counsel.  Id. at 382-83.

The second component of the adequacy requirement focuses on the experience and competence of proposed class counsel.  Before appointing class counsel, the court must satisfy itself that the appointment of plaintiff's counsel as class counsel would be in the best interests of the class.  RCFC 23(g)(2).  In assessing the qualifications and capabilities of proposed class counsel, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[,]" RCFC 23(g)(1)(B).  The court may look to:

(i)     the work counsel has done in identifying or investigating potential claims in the action;

(ii)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)   counsel's knowledge of the applicable law; and

(iv)    the resources that counsel will commit to representing the class[.]

RCFC 23(g)(1)(A).

When plaintiff first sought certification of the class, the court found plaintiff's counsel to be experienced and knowledgeable.  But the court had insufficient evidence about the resources that counsel could commit to representing the class.  Gross, 106 Fed. Cl. at 382-83.  The court anticipated that plaintiff would "have little difficulty in establishing the adequacy of his attorneys' resources if he provide[d] the required information" at such time as he renewed his motion.  Gross, 106 Fed. Cl. at 383, n. 12. The court now considers the evidence before it.

Arlene F. Boop is plaintiff's attorney of record.  She is assisted by her partner, Daniel L. Alterman, and a partner with the law firm of Traub & Traub, P.C., Doris G. Traub.  Plaintiff submitted declarations from Ms. Boop and Ms. Traub with his renewed motion about the qualifications of, and the resources available to, his counsel.  Boop Supp'l Decl., ECF No. 43-6; Traub Supp'l Decl., ECF No. 43-2.  As explained in the declarations, the firm of Alterman & Boop LLP is comprised of two partners, an associate, and one paralegal.  Boop Supp'l Decl. ¶ 7; Savits Supp'l Decl. ¶1, ECF No. 43-7.  In addition to its own staff – as assisted by Ms. Traub – the firm has identified a large number of well-qualified candidates available to work on a project by project basis should the need for more staff arise.  Boop Supp'l Decl. ¶ 7-10; Tr. 114. The firm also has a number of long established credit lines and loan guarantees to cover any unforeseen costs of litigation.  Id.

Defendant challenges the adequacy of plaintiff's counsel, arguing that a "small firm" such as that of plaintiff's counsel "would be hard-pressed to manage a class action of over 3,000 potential members located throughout the country."  Def.'s Resp. 18-19, ECF No. 49.  In support of its argument defendant looks to the case of Walter v. Palisades Collection, LLC, Civ. Action No. 06-378, 2010 WL 308978 (E.D. Pa. Jan. 26, 2010).  Id.

In Walter, the proposed counsel were a father and daughter in a two partner firm. The father had been disbarred, and the daughter had been reprimanded for assisting her father with the unlicensed practice of law.  Pl.'s Reply. 14; Tr. 114-15.  The firm was admonished for a "history of dilatoriness" in its handling of the proposed class action. Id.; Walter, 2010 WL 308978, at *11.  The court in Walter found counsel to be inadequate to represent the proposed class based on facts other than firm size – to include proposed counsel's own admission that the firm might have trouble handling the action. Walter, 2010 WL 308978, at *10-11 ("The Court's decision is arrived at with a heavy heart.").

Plaintiff contends, and the court agrees, that this example of the inability of a two-attorney firm to represent a nationwide class is distinguishable from the facts here. Plaintiff explains that to date, his counsel has completed three years of voluminous

discovery, has negotiated a stipulation of facts, has performed data analysis, has prepared various filings, and has argued several motions. In so doing, counsel has demonstrated both the ability and the resource capacity to represent the proposed class. Pl.'s Renewed Mot. 35; Tr. 113-14. Plaintiff maintains that the size of the firm alone is not a determinative component of adequacy and points, as support, to the appointment of a sole practitioner in Jones v. United States, to serve as class counsel. Pl.'s Reply 15 (citing Jones v. United States, 118 Fed. Cl. 728, 734 (2014)).

Plaintiff has shown, by preponderant evidence, that his counsel can represent the proposed class adequately, and thus, the adequacy requirement is satisfied.

4.     Superiority

Under Rule 23, a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(3). A prospective class representative satisfies this requirement by showing that "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem Prods., Inc., 521 U.S. at 615 (quoting FRCP 23 Advisory Committee Note (1966 Amendment)). In assessing the superiority factor, the court is "essentially" conducting "a cost/benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and [to] the individual members likely to be derived from maintaining such an action." Barnes v. United States, 68 Fed. Cl. 492, 499 (2005). In evaluating superiority, the court considers the following: (1) "the class members' interests in individually controlling the prosecution of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by class members;" and (3) "the likely difficulties in managing a class action." RCFC 23(b)(3).

When plaintiff first sought class certification, he failed to prove that a class action was superior to other methods for adjudicating claims for Sunday premium pay. Gross, 106 Fed. Cl. at 383-84. The court stated that it was not "possible to ascertain the difficulties in managing a class in this case" because "a necessary threshold issue–how to determine eligibility for Sunday premium pay–ha[d] not been resolved . . . ." Id. at 384. But, the court observed that plaintiff satisfactorily had addressed the second factor – that there was no existing prior litigation that would prevent this case from proceeding as a class. Id.

As to the first component of the superiority requirement, the court considers "whether the class members would pursue their individual claims if the class were not certified." Fisher v. United States, 69 Fed. Cl. 193, 205 (2006). The Supreme Court stated that, "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may

be without any effective redress unless they may employ the class-action device." Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper, 445 U.S. 326, 339 (1980); Curry v. United States, 81 Fed. Cl. 328, 338 (2008) (noting that "one of the main justifications for class actions" is the existence of numerous claims that "are too small to justify being brought individually").

Through discovery, plaintiff now has established that the individual claims of the putative class members are modest in amount.  Because the claims, on average, are less than $2300 per class member, they are unlikely to be pursued outside of a class action. Pl.'s Renewed Mot. 27.

As to the third component, that is "the likely difficulties in managing a class action," the court must consider "the whole range of practical problems that [might] render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974).  Over the last few years, this court has certified several classes in civilian pay cases.  See, e.g., King, 84 Fed. Cl. at 120; Curry, 81 Fed. Cl. at 328; Barnes, 68 Fed. Cl. at 499.  Moreover, because the earlier raised concern about a potential class member's eligibility for Sunday premium pay has been resolved and can be determined on a classwide basis, the court can perform a cost/benefit analysis of class certification.

Plaintiff has indicated that the process of identifying eligible claimants and determining the claim amounts is a straightforward matter of examining the payroll information obtained through discovery.  Pl.'s Renewed Mot. 39; Savits Supp'l Decl.; Savits Exs. 1-13; Tr. 102-07.  Thus, the small value of the individual claims, and the availability of generalized evidence are factors that tip in favor of certifying the class. Plaintiff has shown that a class action is superior to other methods for fairly and efficiently adjudicating the Census Bureau field employees' Sunday premium pay claims.

Because plaintiff has met his outstanding burden of proof as to numerosity, commonality, adequacy, and superiority, the motion for class certification is **GRANTED**.

V.     Conclusion

For the foregoing reasons, defendant's motion for partial dismissal is **GRANTED**, plaintiff's claims for Sunday premium pay that pre-date October 28, 2005 are **DISMISSED**, plaintiff's motion for summary judgment is **GRANTED**, defendant's cross-motion for summary judgment is **DENIED**, and plaintiff's motion for class certification is **GRANTED**.

Consistent with the findings set forth above, the class is defined to include all: part-time Field Representatives and Senior Field Representatives employed by the Census Bureau – from October 28, 2005 to the present – who performed nonovertime

work on a Sunday and did not receive Sunday premium pay for that work under 5 U.S.C. § 5546(a).

The court appoints Arlene F. Boop as class counsel joined by Doris G. Traub and Daniel L. Alterman who may serve in the role "of counsel."

On or before **December 5, 2016**, the parties shall file a joint status report proposing a plan to satisfy the notice requirements of Rule 23(c)(2) and addressing further notice proceedings.

IT IS SO ORDERED.


 s/ Patricia Campbell-Smith
PATRICIA CAMPBELL-SMITH
Chief Judge